**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| KATHERINE R. CHILDRESS, | CASE NO. 1:24-CV-02022-AMK |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Plaintiff Katherine Childress ("Plaintiff" or "Ms. Childress") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") and Medicare Qualified Government Employee ("MQGE") benefits.[1]  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 10.)

For the reasons set forth below, the Court **AFFIRMS** the Commissioner's final decision.

## I.     Procedural History

On July 29, 2019, and August 9, 2019, Ms. Childress filed applications for MQGE benefits and SSI respectively, alleging a disability onset date of February 28, 2018.  (Tr. 161-62.) She alleged disability due to spontaneous coronary artery dissection ("SCAD"), fibromyalgia,

---

[1] Eligibility for MQGE benefits is limited to certain categories of former Federal employees.  20 C.F.R. § 404.1018(b).  For purposes of this appeal, the same legal standard is applicable to both SSI and MQGE claims.  *See* 42 C.F.R. §§ 406.12(a), 406.15(a) & (c).  Disability insurance benefits and supplemental security income are codified independently, but the regulations relevant to this case are virtually identical and therefore decisions rendered under 42 U.S.C. § 423 are also applicable to decisions rendered under 42 U.S.C. § 1381a.  *Sullivan v. Zebley*, 493 U.S. 521, 525 n. 3 (1990).

1

post-traumatic stress disorder ("PTSD"), depression, anxiety, osteoarthritis, and bursitis.  (Tr. 117-18, 139-40.)  Her applications were denied at the initial level (Tr. 161-62) and upon reconsideration (Tr. 189-90), and she requested a hearing (Tr. 284).  On November 23, 2020, a telephonic hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 97-116.)  On December 23, 2020, the ALJ issued a decision finding Ms. Childress has not been under a disability within the meaning of the Social Security Act from February 28, 2018, through the date of the decision.  (Tr. 191-214.)  Ms. Childress sought review of the decision by the Appeals Council, which remanded the case to the ALJ for further evaluation.  (Tr. 215-18.)

On remand, the same ALJ conducted another hearing on April 4, 2022 (Tr. 66-97) and issued a decision denying benefits on May 9, 2022 (Tr. 221-48).  Again, Ms. Childress sought review of the decision by the Appeals Council, and the Appeals Council remanded the case to the ALJ for further review.  (Tr. 249-52).

On this second remand, a new ALJ conducted a hearing on August 21, 2023.  (Tr. 44-65.)  On October 31, 2023, the ALJ issued a decision finding Ms. Childress has not been under a disability within the meaning of the Social Security Act from February 28, 2018, through the date of the decision.  (Tr. 14-43.)  Ms. Childress requested review of the decision by the Appeals Council.  (Tr. 7.)  On September 23, 2024, the Appeals Council found no reason to review the decision, making the decision the final decision of the Commissioner.  (Tr. 1.)  Ms. Childress filed a Complaint challenging the decision on November 20, 2024 (ECF Doc. 1), and the matter is fully briefed (ECF Docs. 11, 13, 14).

## II.        Evidence

### A.        Personal, Educational, and Vocational Evidence

Ms. Childress was born in 1973 and was 44 years old on the alleged disability onset date, making her a younger individual under Social Security regulations on the alleged onset date. (Tr. 117, 139.)  She has at least a high school education.  (Tr. 136.)  She has not worked since February 28, 2018, the alleged onset date.  (Tr. 118, 140.)

### B.        Medical Evidence

While the ALJ found Ms. Childress had various physical and mental impairments (Tr. 20), Ms. Childress bases her arguments on her neuropathy symptoms, anxiety, PTSD, and the medical opinions of her treating providers (ECF Doc. 11, pp. 19-25).  The evidence summarized herein therefore focuses on those conditions and opinions.

#### 1.        Treatment Predating Alleged Onset Date

On November 17, 2016, Ms. Childress presented as a new patient to Kristen A. Smith, MD, at Associates in Neurology Inc.  (Tr. 1698.)  She complained of dizziness and lightheadedness, migraines, and numbness in her upper and lower bilateral extremities.  (*Id.*)  Dr. Smith assessed her with migraine with aura and status migrainosus, not intractable.  (*Id.*)  She prescribed amitriptyline 10mg to increase to 20mg over three months.  (*Id.*)

On June 19, 2017, Ms. Childress attended an appointment with Iryna Cribley, NP, at Erieside Medical, for evaluation of constant joint pain.  (Tr. 1488-91.)  She informed NP Cribley that she had undergone surgery on her left hip after a car accident and complained of pain in all her joints that seemed to be worsening, stiffness upon waking that lasted about an hour, and weakness in her hands with difficulty gripping.  (Tr. 1488.)  Anti-inflammatory medications had been minimally effective.  (*Id.*)  Ms. Childress denied falls, headache, tingling, numbness,

swelling, or tremor.  (*Id.*)  On examination, she was alert and oriented, had a normal gait, displayed grossly normal cognitive function, and showed weak grip in both hands that was symmetrical bilaterally.  (Tr. 1489.)  NP Cribley assessed Ms. Childress with arthralgia, unspecified joint (*id.*), referred her to a rheumatologist, and ordered blood work and x-rays of both hands (Tr. 1491).  X-rays of her hands on June 21, 2017, suggested mild periarticular osteopenia as a nonspecific finding.  (Tr. 1532.)

Ms. Childress underwent a CT scan of her thoracic spine on June 28, 2017, because she was experiencing numbness.  (Tr. 1426-27.)  The scan was normal.  (Tr. 1426.)

On September 13, 2017, Ms. Childress presented to NP Cribley for reevaluation of elbow pain.  (Tr. 1472-74; *see* Tr. 1481 (presenting to NP Cribley in July 2017 with elbow pain).)  A brace had been "minimally effective."  (Tr. 1472.)  Ms. Childress denied falls, balance difficulties, numbness/tingling, memory loss, or headaches, but reported shortness of breath, weakness, and loss of strength in upper extremities.  (*Id.*)  On examination, she was alert and oriented, her cognitive exam was grossly normal, her gait was normal, and she displayed weak grip in both hands that was symmetrical bilaterally.  (Tr. 1473-74.)  She also reported pain over the lateral epicondyles with palpation and when twisting her arm.  (*Id.*)  NP Cribley diagnosed anxiety, arthralgia, unspecified joint, right tennis elbow, and golfer's elbow.  (*Id.*)

On December 8, 2017, Ms. Childress followed up with Jonathan White, M.D., at Cleveland Clinic cardiology for the long-term management of her cardiac conditions.  (Tr. 1079-81; *see* Tr. 696 (noting that Ms. Childress had been hospitalized for five days shortly after Thanksgiving).)  She was doing well following hospitalization and was not experiencing any cardiac symptoms.  (Tr. 1081.)  During the previous two to three weeks, she reported experiencing intermittent chest pain or pressure that sometimes radiated to her arms, head, and

neck; these symptoms had led her to seek emergency care.  (*Id.*)  Dr. White characterized these symptoms as "distinct" from those that occurred when Ms. Childress presented with elevated cardiac enzymes, as they lasted one minute at a time, were unpredictable, and did not reliably stem from exertion.  (*Id.*)  Ms. Childress also described prominent features of anxiety, including a sense of impending doom, hyperventilation, and perioral numbness.  (*Id.*)  He referred Ms. Childress to a SCAD clinic, ordered an EKG, and recommended she meet a psychologist.  (*Id.*)

On December 11, 2017, Ms. Childress saw her primary care provider, Winston Ho, M.D., at Erieside Medical Group to follow-up on November emergency room visit.  (Tr. 1469-70.)  She reported that she experienced "a lot of anxiety and apprehension and panic attacks," but her panic attacks were not daily.  (Tr. 1469.)  At the hospital she had been given benzodiazepine, which helped "greatly."  (*Id.*)  On examination, Ms. Childress was alert and oriented, had no gross cranial or motor deficit, and walked with a normal gait.  (Tr. 1469-70.)  She denied depression, weakness, fatigue, and headache.  (Tr. 1470.)

## 2.    Treatment After the Alleged Onset Date

On April 4, 2018, Ms. Childress presented to Deirdre Raimey, CNP, at Cleveland Clinic Psychology for a new patient evaluation.  (Tr. 1369-74.)  She described having a heart attack in June 2017 that resulted in her being resuscitated and having two stents placed.  (Tr. 1369.)  She had returned to the ER in September 2017 thinking she was having another cardiac event.  (*Id.*)  She was told she was not having a heart attack, but one of the stents had collapsed, and she had dissections.  (*Id.*)  She told CNP Raimey that her "chest hurts all the time," she was always short of breath, and she was not sleeping well because she did not know when to be concerned.  (*Id.*)  On mental status examination, Ms. Childress was fully oriented, behaved appropriately, and displayed euthymic mood, intact and linear associations, and appropriate insight/judgment.  (Tr.

5

1372.)  CNP Raimey diagnosed panic disorder/anxiety disorder with agoraphobia, anxiety
disorder due to a medical condition, and mood disorder/major depressive disorder.  (Tr. 1373.)
She prescribed Zoloft, Klonopin, and Trazodone, encouraged continuing therapy, and
recommended follow-up in six to eight weeks.  (Tr. 1372-73.)

On May 5, 2018, Ms. Childress attended an appointment with Dr. Ho following a recent
emergency room visit.  (Tr. 1507-08.)  She had gone to the emergency room a few days earlier
due to mid-chest pain that radiated to the left arm.  (Tr. 1507.)  An EKG showed no acute
changes and ruled out myocardial infarction.  (*Id.*)  Ms. Childress refused recommended
admission to the hospital.  (*Id.*)  Since her discharge, she had experienced some chest pain but it
was not as bad.  (*Id.*)  She was following with cardiology and psychiatry.  (*Id.*)  On examination,
she was alert and oriented with a good mood, she had no gross cranial or motor deficit, and her
gait was normal.  (Tr. 1507-08.)  Dr. Ho recommended seeing her cardiologist sooner, staying
off work, and continuing her medications.  (Tr. 1508*.*)

Ms. Childress saw Dr. Ho again on June 14, 2018.  (Tr. 1505.)  She reported feeling
frustrated and stressed out due to continued chest pain and said she planned to apply for
disability because she was no longer allowed to drive a bus.  (*Id.*)  She did not have shortness of
breath but reported numbness of the hands that came and went without weakness.  (*Id.*)  Dr. Ho
assessed Ms. Childress with peripheral neuropathy and referred her to neurology.  (*Id.*)

At Dr. Ho's referral, Ms. Childress returned to see Dr. Smith on July 5, 2018, for
complaints of peripheral neuropathy, burning, tingling, imbalance, and migraines.  (Tr. 1419.)
She reported migraine with aura of dizziness and significant paresthesia in her bilateral upper
and lower extremities.  (*Id.*)  Dr. Smith assessed her with migraine with aura and status
migrainosus, not intractable, and recommended stopping Topamax to see if that resolved the

6

paresthesia.  (*Id.*)  If that did not help, she would order blood work and an electromyogram

("EMG").  (*Id.*)  On examination, Ms. Childress was alert and oriented, had normal cortical

functions and speech, and displayed normal motor strength and gait.  (Tr. 1419-20.)

Ms. Childress saw CNP Raimey for a psychiatry follow-up on July 18, 2018.  (Tr. 1375-

77.)  Since the last visit, her anxiety medications had been adjusted to replace Zoloft with

Cymbalta and Klonopin with Ativan.  (Tr. 1375.)  She reported numbness in her hands and feet,

difficulty falling asleep, and continuing depression/anxiety despite medications.  (*Id.*)  She had

experienced a panic attack that was not debilitating.  (*Id.*)  Her speech was clear, associations

intact, thought processes logical and coherent, memory intact, mood euthymic/anxious, affect

full and appropriate, and concentration normal.  (Tr. 1376.)  CNP Raimey discontinued

Cymbalta and prescribed Effexor, 75mg once daily, continuing all other medications.  (Tr. 1377.)

She recommended follow-up in four to six weeks.  (*Id.*)

On September 13, 2018, Ms. Childress presented to Dr. Ho for a checkup.  (Tr. 1499-

1501.)  She denied shortness of breath or chest pain and stated that her cardiologist had

discontinued Topamax.  (Tr. 1499.)  She reported tingling and numbness in the toes and fingers

but denied gait imbalance or focal weakness/numbness.  (*Id.*)  She was "feeling much better

overall," and her anxiety was much better.  (*Id.*)  A physical examination was normal.  (Tr. 1499-

1500.)  Dr. Ho assessed Ms. Childress with paresthesia, oligoarthritis, and hyperlipidemia,

unspecified type.  (Tr. 1500.)  He ordered several labs to test for rheumatoid conditions and

recommended a follow-up in three months.  (Tr. 1500-01.)

At a cardiology appointment on October 4, 2018, Ms. Childress reported struggling with

anxiety and PTSD related to her heart conditions, but she was doing "a little better."  (Tr. 1044.)

On October 8, 2018, Ms. Childress attended a follow-up on her migraines with Dr. Smith. (Tr. 1416.)  Her migraines were adequately controlled using Tylenol.  (*Id.*)  She reported her hands and feet felt "pretty numb" and heavy.  (*Id.*)  Dr. Smith assessed her with migraine with aura and status migrainosus, not intractable, and anxiety; she did not prescribe any new medications.  (*Id.*)  On examination, Ms. Childress was alert and oriented, had normal cortical functions and speech, and displayed normal motor strength and gait.  (Tr. 1416-17.)

Ms. Childress returned to see Dr. Ho on December 13, 2018.  (Tr. 1496-97.)  She reported pain and numbness in the left upper extremities and dropping things from her left hand. (Tr. 1496.)  She denied depression, shortness of breath, and chest pain.  (*Id.*)  Dr. Ho reviewed recent blood work, which was normal.  (*Id.*)  On examination, Ms. Childress was alert and oriented, displayed no gross cranial or motor deficit, displayed mild weakness in left hand grip, and had a normal gait.  (Tr. 1496-97.)  Dr. Ho assessed hypertension, chronic fatigue, oligoarthritis, and fibromyalgia.  (Re. 1497.)  He referred Ms. Childress to specialists for possible radiculopathy/sclerosis and fibromyalgia.  (*Id.*)

On February 6, 2019, Ms. Childress reported to rheumatologist David R. Mandel, M.D., that she had recently been dropping items such as small cups due to stiffness, pain, and swelling in her elbows, hands, wrists, and hips.  (Tr. 1534.)  A physical examination revealed decreased pinch and grip, tenderness over the shoulders, knees, and paracervical and parathoracic spine, and tenderness to palpation over both hips.  (Tr. 1535.)  Dr. Mandel conducted a musculoskeletal ultrasound resulting in a diagnosis of noninflammatory soft tissue type rheumatism.  (Tr. 1537.)

On February 20, 2019, Ms. Childress attended a psychiatry appointment with CNP Raimey.  (Tr. 1379-82.)  Her anxiety had improved with Effexor, but her depression symptoms had worsened.  (Tr. 1379.)  She thought the depression symptoms were associated with the

weather.  (*Id.*)  She reported numb and tingling hands, and her mental status examination was normal, with no suicidal ideations.  (Tr. 1380.)  Dr. Raimey prescribed Zyprexa instead of Trazodone to help with sleep and recommended follow-up in six weeks.  (Tr. 1381.)  She diagnosed PTSD and major depressive disorder ("MDD"), recurrent, moderate.  (Tr. 1382.)

Ms. Childress returned to see Dr. Smith on May 1, 2019.  (Tr. 1413.)  She reported a migraine with neck pain and pins and needles in her arms and legs.  (*Id.*)  Dr. Smith ordered an EMG to test for fibromyalgia or peripheral neuropathy.  (*Id.*)  She prescribed duloxetine HCI, 30 mg once a day, CoQ10, 100 mg once a day, gabapentin, 100 mg twice a day, and fish oil.  (*Id.*)  On examination, Ms. Childress was alert and oriented, had normal speech and cortical functions, and displayed normal motor strength in all extremities with normal gait.  (Tr. 1414.)

On June 7, 2019, Ms. Childress underwent an EMG of the left, upper and lower extremities ordered by Dr. Smith.  (Tr. 1411.)  The EMG findings were as follows: "Normal electrodiagnostic study of the left upper limb and left lower limb. There is no electrodiagnostic evidence of nerve entrapment or generalized peripheral neuropathy."  (Tr. 1700.)

Ms. Childress attended an appointment with rheumatologist Dr. Mandel on June 12, 2019.  (Tr. 1445.)  She complained of widespread stiffness, aching, and soreness in the neck, shoulders, and hips but had no new rheumatic symptoms.  (*Id.*)  Dr. Mandel reviewed an autoimmune disease workup that was normal and negative.  (*Id.*)  His examination revealed some tenderness over the paracervical and paralumbar spine and the trochanteric bursa as well as good strength in biceps and triceps and nearly normal flexion/extension of the knees with some pain over the suprapatellar tendons.  (*Id.*)  Dr. Mandel encouraged continuing low-impact exercise and increased Ms. Childress's dose of gabapentin, as she said it had been helpful.  (*Id.*)

9

On September 30, 2019, Ms. Childress told her cardiologist, Heather Gornik, MD, that she had fallen up the stairs in the last six months due to numb feet.  (Tr. 1821.)  She said her anxiety and depression were "a little bit better."  (*Id.*)  She further reported arthralgias, myalgias, joint stiffness, back pain, headaches, dizziness, and tingling/numbness.  (Tr. 1823.)  She was fully alert and oriented, had a normal gait, and displayed appropriate affect.  (Tr. 1824.)

Ms. Childress saw Dr. Mandel on October 15, 2019.  (Tr. 1633-34.)  She reported less fatigue and stiffness in her neck and shoulders but continued discomfort in her left elbow and left hip.  (Tr. 1633.)  Dr. Mandel diagnosed her with limited Sjogren syndrome, polyarthritis, polymyalgia, and periarthritis of left hip and left shoulder.  (*Id.*)  A physical examination showed a straight spine, tenderness to palpation over both shoulders, some tenderness of the left elbow, tenderness to palpation over the left trochanteric bursa, and slightly limited flexion and extension of the thigh muscles.  (*Id.*)  Dr. Mandel recommended low impact exercise, quitting smoking, and reducing alcohol consumption.  (*Id.*)

Ms. Childress followed up with Dr. Ho on October 16, 2019.  (Tr. 1910-11.)  She reported swelling, pain, and tingling in her extremities, gait imbalance, and pain in the hips, neck, hands, and lower back.  (Tr. 1910.)  She denied headaches and depression.  (*Id.*)  On examination, she was alert and oriented, had no gross cranial or motor deficit, and walked with a normal gait.  (*Id.*)  Based on the recent visit with Dr. Mandel, Dr. Ho assessed seronegative juvenile rheumatoid arthritis and Sjogren's syndrome, with unspecified organ involvement.  (*Id.*)

On November 22, 2019, Ms. Childress saw CNP Raimey for the first time since February 2019.  (Tr. 1677-80.)  She reported no improvement in her depression and anxiety symptoms. (Tr. 1677.)  She felt uncomfortable going outside, was not motivated to do anything, and had seen panic episodes increase.  (*Id.*)  Her review of systems was positive for numbness or tingling

of hands.  (Tr. 1678.)  On mental status examination, she was fully oriented and displayed intact associations, logical and coherent thought processes, intact memory, normal concentration, sad mood, and full/appropriate affect.  (*Id*.)  CNP Raimey discontinued Zyprexa and Effexor, and prescribed Wellbutrin, Buspar, and Xanax.  (Tr. 1679-80.)

On January 16, 2020, Ms. Childress again saw Dr. Ho.  (Tr. 1908-09.)  She informed him that she had undergone an EEG and nerve conduction test with Dr. Smith, but everything was normal, and no diagnosis was made.  (Tr. 1908.)  She was upset, as she experienced gait imbalance and continued to feel very tired and intermittently lightheaded.  (*Id.*)  She denied depression.  (*Id.*)  On physical examination, she looked healthy and had a normal gait.  (*Id.*)  Dr. Ho assessed her with coronary artery disease, dizziness, paresthesia, and chronic fatigue.  (*Id.*)  He did not change her medications but noted he may start her on Provigil.  (*Id.*)

Ms. Childress saw Dr. Mandel on February 12, 2020.  (Tr. 1629-30.)  She reported "quite a bit" of episodic pain in both shoulders and difficulty raising both arms and lying on her shoulders.  (Tr. 1629.)  She did not report radicular-type pain.  (*Id*.)  Dr. Mandel observed tenderness over both shoulders with limited backward extension, limited strength in biceps and triceps due to shoulder pain, tenderness and trigger points over the forearms, and slightly limited flexion/extension of the knees.  (*Id*.)  A musculoskeletal ultrasound was consistent with inflammatory tendinosis.  (Tr. 1631.)  He did not change his diagnoses from the previous visit.  (Tr. 1630.)  He noted that Ms. Childress had not responded fully to gabapentin and started a trial of Savella and Plaquenil.  (*Id*.)

On June 25, 2020, Ms. Childress reported to Dr. Ho that she felt depressed and experienced disabling pain in the elbows, shoulders, hips, knees, and back due to Sjogren's syndrome.  (Tr. 1902.)  Dr. Ho refilled her hydroxychloroquine.  (Tr. 1903.)

On August 19, 2020, Ms. Childress followed up with Dr. Mandel, continuing to report pain, stiffness, and soreness in her wrists, hands, and knees. (Tr. 1727.)  She also said it was difficult to lie on her hips at times, and Plaquenil and Savella had been ineffective. (*Id*.)  On examination, her spine was straight, and there were tender areas over her neck and shoulders and about her hips, knees, and lower legs. (*Id*.)  Dr. Mandel diagnosed painful rheumatism, limited Sjogren syndrome, and periarthritis of hips and knees. (*Id*.)  He provided Ms. Childress with information about fibromyalgia, recommended more stretching and strengthening exercises, and prescribed Aralen with plans to reassess in a few months. (Tr. 1728.)

Ms. Childress attended her first psychiatry appointment in almost a year on September 11, 2020, via telehealth. (Tr. 2010-12.)  She reported that things were "going well" since her medications were adjusted the previous fall. (Tr. 2010.)  She had a few "blah" days and attributed an increase in depression symptoms to COVID-19 restrictions. (*Id.*)  She continued to have problems going out in public and preferred staying within two miles of her home.  She did not have panic episodes as often. (*Id.*)  Her chronic, persistent, daily pain was manageable. (*Id.*)  She had been journaling to express her feeling in lieu of therapy. (*Id.*)  She was satisfied with her medication regimen. (*Id.*)  Her mental status examination was normal, with intact associations, logical thought processes, full orientation, intact memory, normal concentration, euthymic mood, full and appropriate affect, and no suicidal ideations. (Tr. 2011-12.)  Her ongoing diagnoses were confirmed, and all medications were continued. (Tr. 2012.)

At another follow-up with Dr. Ho on December 28, 2020, Ms. Childress reported fatigue and recent burning and tingling in her hands and feet. (Tr. 1897.)  She also reported ongoing "absolute pain" and need for a cane associated with her rheumatoid disease. (*Id.*)  She continued to experience depression. (*Id.*)  On examination, she showed no gross cranial or motor deficits

12

and had a normal gait.  (*Id.*)  Dr. Ho assessed her with lumbago and paresthesia.  (*Id.*)  He increased her Tramadol dose and ordered labs to assess her paresthesia.  (Tr. 1897-98.)

On February 19, 2021, Ms. Childress presented to Dr. Mandel and did not report new rheumatic symptoms.  (Tr. 1966.)  She did report more restlessness and fidgeting in her arms and legs, saying she woke at times with her legs jerking.  (*Id.*)  Dr. Mandel prescribed Requip to address this.  (Tr. 1967.)  He continued his previous diagnoses unchanged, and examination findings noted minimal pain and tenderness over her hands and wrists as well as some tender areas over the trochanteric and ischial bursae.  (Tr. 1966.)

At a primary care appointment on March 29, 2021, Dr. Ho noted the results of Ms. Childress's labs but did not indicate that they were abnormal.  (Tr. 1895.)  At this visit, Ms. Childress complained only of low back pain that radiated into her buttocks and legs with no focal weakness.  (*Id.*)  As Tramadol was no longer helping, Dr. Ho recommended switching to Tylenol.  (*Id.*)  He assessed Ms. Childress with low back pain and other chronic pain.  (*Id.*)

Ms. Childress underwent another musculoskeletal ultrasound on June 29, 2021, with Dr. Mandel.  (Tr. 1964.)  The findings were consistent with inflammatory arthritis.  (*Id.*)  At an appointment that same day, Ms. Childress reported that Requip had not helped with muscle cramping, pain, and restlessness.  (Tr. 1962.)  She also reported more pain and soreness in her hips and lower back without radicular pain or new rheumatic symptoms.  (*Id.*)  On examination, she was "quite tender and painful" over the right hip and sacroiliac areas with some paravertebral spasms.  (*Id.*)  Logrolling motion of her hips was "almost normal," and she had some tenderness of the right trochanteric bursa.  (*Id.*)  Dr. Mandel diagnosed periarthritis, spinal arthritis, and limited Sjogren syndrome.  (*Id.*)  He started meloxicam and Zanaflex, recommended a physical therapist, and ordered acute phase reactant studies and spine x-rays.  (Tr. 1963.)

On September 28, 2021, Ms. Childress presented to Dr. Smith reporting that she had been experiencing "episodic dystonia with post-event weakness concerning for possible seizures." (Tr. 1764.)  She reported no feeling in her toes and said her left upper and lower extremities would spontaneously develop sharp, excruciating pain, become stiff and rigid for about a minute, then feel weak for ten minutes to an hour.  (*Id.*)  Dr. Smith ordered an EEG and MRI to evaluate the underlying cause of these incidents.  (*Id.*)  On examination, Ms. Childress was alert and oriented, with no tremors, normal strength in all extremities, and normal gait.  (Tr. 1765.)

On November 30, 2021, Ms. Childress follow-up with Dr. Smith after the EEG and MRI, both of which were normal.  (Tr. 1759; *see* Tr. 1762-63 (record of MRI of the brain on October 20, 2021).)  Ms. Childress and Dr. Smith discussed adjusting her medication to treat migraines. (Tr. 1759.)  A physical examination showed normal strength in all extremities and normal gait. (*Id.*)  Ms. Childress denied muscle weakness, numbness, or tingling (Tr. 1761), though Dr. Smith assessed her with fibromyalgia and paresthesia (Tr. 1759-60).

Ms. Childress presented to Dr. Mandel on February 24, 2022.  (Tr. 1956-57, dup. at 1865-66, 2679-80.)  She reported "a bit more" pain and stiffness in her hands and wrists with some aching in her legs but no radicular pain.  (Tr. 1956.)  She had not started physical therapy because her mother had recently moved in with her family, causing more physical and emotional stress.  (*Id.*)  On examination, Ms. Childress had a straight spine, experienced pain on palpation in both wrists, and had tender areas over the lateral epicondyles of the elbows and forearms and over the trochanteric bursae.  (*Id.*)  Dr. Mandel diagnosed painful rheumatism, seronegative inflammatory arthritis, multiple joint involvement, periarthritis, and limited Sjogren syndrome. (Tr. 1957.)  He discontinued meloxicam, started nabumetone, and increased gabapentin.  (*Id.*)

14

On March 22, 2022, Ms. Childress saw Dr. Ho for restlessness, numbness, and tingling in her hands and feet, mostly in the mornings.  (Tr. 2629.)  She reported that her hands were "jumping with jerking motions" and sometimes she knocked things off the table or spilled her coffee.  (*Id.*)  She was planning to have an EEG with Dr. Smith after her upcoming disability hearing.  (*Id.*)  An examination showed a normal gait and no tremors or neurological deficits in the extremities.  (Tr. 2629-30.)  Dr. Ho assessed Ms. Childress with tremor of both hands and noted that past blood tests had been normal.  (Tr. 2630.)

Ms. Childress attended a telehealth psychiatry follow-up with CNP Raimey on April 28, 2022.  (Tr. 2296-2300.)  She stated that her anxiety had been high, and everything was "too loud" and "too much."  (Tr. 2296.)  She found it difficult to go shopping and be around people in social settings.  (*Id.*)  She had trouble sleeping due to restlessness and pain.  (*Id.*)  She was not receiving psychotherapy but found talking to her primary care provider "somewhat comforting." (*Id.*)  On mental status examination, she was fully oriented, reported no suicidal ideations, and displayed intact memory, normal concentration, euthymic and anxious mood, restricted affect, clear speech, intact associations, and logical thought processes.  (Tr. 2299.)  Her diagnoses remained unchanged, and CNP Raimey discontinued Buspar and Wellbutrin.  (*Id.*)

### 3.      Opinion Evidence

#### i.      Treating Sources

##### a)      John Samsa, DO

John Samsa, DO, completed a Medical Source Statement on September 10, 2018.  (Tr. 716-20.)  He treated Ms. Childress for her cardiac conditions from June 2017 to December 2017 and diagnosed her with SCAD based on cardiac catheterization and EKG's.  (Tr. 717.)  Her prognosis was fair.  (*Id.*)  Her symptoms included chest pain, anginal equivalent pain, and

nausea.  (*Id.*)  There were no evidence-based treatments for her condition, and she was referred to the SCAD clinic at the Cleveland Clinic for treatment when needed.  (Tr. 718.)

Dr. Samsa stated that Plaintiff's condition was related to stress and opined that she was incapable of even low stress work and could not tolerate a competitive work situation.  (*Id.*)  Her conditions also caused significant anxiety.  (*Id.*)  Dr. Samsa did not know how long Ms. Childress could sit or stand/walk in an eight-hour workday, nor did he know whether she needed a job that permitted shifting positions at will.  (*Id.*)  He opined that she would need to take unscheduled breaks during a workday but did not know how often this would need to happen.  (*Id.*)  He offered no opinion on her exertional or postural limitations.  (Tr. 719.)  He opined that she should avoid concentrated exposure to wetness, avoid moderate exposure to dust, chemicals and other irritants, and avoid all exposure to extreme cold or heat, high humidity, cigarette smoke, perfumes, soldering fluxes, solvents/cleaners, and fumes, odors, and gas.  (*Id.*)  Lastly, he opined that she would be off-task 25% or more of the workday and absent from work more than four days per month.  (Tr. 720.)  He noted that Ms. Childress had a rare condition, she had not managed the symptoms well, and this "essentially ma[de] it impossible for her to work."  (*Id.*)

### b)    Heather Gornik, M.D.

Heather Gornik, M.D., completed a medical source statement on May 22, 2020.  (Tr. 1656-61.)  She had been treating Ms. Childress for her cardiac conditions since 2017 and continued to see her twice a year.  (Tr. 1658.)  Ms. Childress was diagnosed with SCAD, vertical dissection, headaches, and anxiety; her prognosis was good.  (*Id.*)  Her symptoms included chest pain, dizziness, palpitations, balance issues, and pain in neck/headache.  (*Id.*)

Dr. Gornik opined that stress impacted Ms. Childress's conditions, making her capable of only low stress work.  (Tr. 1659.)  Her conditions also caused emotional difficulties such as

depression or chronic anxiety.  (*Id.*)  She needed to shift positions at will and would need

unscheduled breaks during the workday; but Dr. Gornik did not indicate how often or for how

long.  (*Id.*)  Dr. Gornik further opined that Ms. Childress could: never lift or carry 50 pounds;

occasionally lift or carry 20 pounds; frequently lift up to 10 pounds; occasionally twist, stoop,

crouch/squat and climb stairs; and rarely climb ladders.  (Tr. 1660.)  She should avoid

concentrated exposure to high humidity, wetness, cigarette smoke, solvents/cleaners, fumes,

odors, and gases, dust, and chemicals and avoid moderate exposure to extreme cold or heat.  (*Id.*)

Dr. Gornik was not sure what percentage of the workday Ms. Childress would be off task and did

not give an opinion as to how many days a month she would miss work.  (Tr. 1661.)

### c)   Deirdre D. Raimey, CNP

Deirdre D. Raimey, CNP, completed a mental impairment questionnaire on September 3,

2020.[2]  (Tr. 1706-10.)   She had treated Ms. Childress since April 2018 but last saw her on

November 22, 2019.  (Tr. 1706.)  Ms. Childress had been diagnosed with PTSD, MDD, multiple

cardiac conditions, headaches, asthma, and hypertension.  (*Id.*)

CNP Raimey indicated that work would be difficult for Ms. Childress due to her mental

and physical symptoms, including symptoms of diminished interest in activities, decreased

energy, feelings of guilt or worthlessness, depressed mood, exposure to actual or threatened

death, serious injury or violence, subsequent involuntary re-experiencing of the traumatic event,

fatigue, restlessness, difficulty thinking or concentrating, frequent distractibility, increased in

arousal and reactivity, unrealistic interpretation of physical signs associated with the

---

[2] CNP Raimey also filled out a questionnaire for the Opportunities for Ohioans with Disabilities Division of
Disability Determination on August 19, 2019, and the ALJ considered this opinion in her decision, finding it
unpersuasive.  (Tr. 31 (citing Tr. 1365-67).)  However, Plaintiff does not appear to challenge the ALJ's
consideration of this questionnaire, only citing the mental impairment questionnaire in her brief.  (ECF Doc. 11, p.
24.)  The August 2019 statement from CNP Raimey simply states that it would be difficult for Ms. Childress to
tolerate stress and refers the reader to CNP Raimey's attached treatment notes.  (Tr. 1365-67.)

preoccupation or belief that one has a serious disease/injury, memory impairment, and panic attacks, with persistent concern about additional panic attacks.  (Tr. 1707-08.)

CNP Raimey provided a functional assessment of Ms. Childress's mental abilities in the four categories of mental functioning, finding she had: a marked to extreme limitation in her ability to understand, remember, or apply information; a mild to moderate limitation in her ability to interact with others; a marked to extreme limitation in her ability to concentrate, persist, and maintain pace; and a mild to moderate limitation in her ability to adapt or manage oneself.  (Tr. 1709.)  CNP Raimey indicated that Ms. Childress's mental disorder was "serious and persistent" and that she had minimal capacity to adapt to changes in her environment or demands that were not already part of her daily life.  (*Id.*)  She further opined that Ms. Childress was likely to be off task 25% or more of the workday, was incapable of low stress work, and would be absent about four days per month.  (Tr. 1710.)

On March 8, 2022, CNP Raimey completed a second mental impairment questionnaire. (Tr. 1753-57.)  She reported that she saw Ms. Childress twice a year and had last seen her on September 11, 2020.  (Tr. 1753.)  Her diagnoses remained unchanged, and she was stable on Trazodone, Wellbutrin, Buspar, and Xanax.  (*Id.*)  CNP Raimey noted that Ms. Childress's physical ailments contributed to her mental health and that PTSD could cause physical panic symptoms.  (Tr. 1754.)  Ms. Childress's reported symptoms were unchanged.  (Tr. 1754-55.)

CNP Raimey's opinion of Ms. Childress's functional limitations in the four categories of mental functioning remained unchanged.  (Tr. 1756.)  She continued to opine that Ms. Childress's mental disorder was "serious and persistent" and that she had minimal capacity to adapt to changes in her environment or demands that were not already part of her daily life.  (*Id.*)

She further opined that Ms. Childress would be off task more than 25% of the workday, was capable of low stress work, and would be absent about three days per month.  (Tr. 1757.)

### ii.    State Agency Medical Consultants[3]

On November 19, 2019, state agency medical consultant William Bolz, M.D., completed a Residual Functional Capacity ("RFC") assessment.  (Tr. 131-33, 153-55.)  He opined that Ms. Childress could: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand/walk or sit for about six hours in an eight-hour workday; frequently climb ramps/stairs and balance; occasionally stoop, kneel, crouch, and crawl; and never climb ladders ropes or scaffolds.  (Tr. 131-32, 153-54.)  She should avoid all exposure to hazards such as machinery or heights.  (Tr. 132-33, 154-55.)  On reconsideration on June 17, 2020, Abraham Mikalov, M.D., affirmed Dr. Bolz's opinion.  (Tr. 171-73, 185-86.)

### iii.    State Agency Psychological Consultants

On December 5, 2019, state agency psychological consultant Irma Johnston, Psy.D., conducted a psychiatric review technique (Tr. 128-29, 150-51) and mental RFC assessment (Tr. 133-35, 155-57).  She opined that Ms. Childress had no limitations in her ability to interact with others and moderate limitations in her abilities to understand, remember and apply information, concentrate, persist, and maintain pace, and adapt or manage oneself.  (Tr. 128-29, 150-51.)  She further opined that Ms. Childress had the mental RFC to: understand and recall instructions for simple, repetitive tasks; sustain attention, concentration, persistence, and pace to perform simple routine tasks that do not have fast-paced performance or strict production requirements; and carry out tasks in situations where duties are relatively static and changes can be explained.  (Tr.

---

[3] The record also contains opinions from consultative examiner Natalie Whitlow, Ph.D.  (Tr. 1020-29, 1578-89.)  As Plaintiff does not challenge the consideration of these opinions, a summary is not necessary to deciding this appeal.

134-35, 155-57.)  On June 17, 2020, on reconsideration, state agency psychological consultant Paul Tangeman, Ph.D., affirmed Dr. Johnston's findings.  (Tr. 168-69, 173-74, 181-82, 186-87.)

## C.    Function Report

Ms. Childress completed an Adult Function Report on October 1, 2019.  (Tr. 548-55.) She reported that she lived in a house with family.  (Tr. 548.)  Her ability to work was limited by pain with walking and sitting, lift/carry restrictions, nausea, dizziness, shortness of breath, chest pain, confusion, depression, vision issues, and vertigo.  (*Id.*)  Before her heart attack, she had no limitations.  (Tr. 549.)

On a normal day, Ms. Childress woke up, got her children ready for school, napped, tried to do laundry or clean the house for an hour or two, napped, picked up the kids from school, made dinner, rested, and finished folding laundry.  (*Id.*)  Without medication, she slept four hours a night.  (*Id.*)  She had no problems with personal care.  (*Id.*)  She cared for a dog and a cat by feeding them and letting them go outside.  (*Id.*)  Her children were older and helped around the house and with walking the dog.  (*Id.*)  Her son did the yard work, and her daughter mopped and vacuumed.  (Tr. 551.)

Ms. Childress used her phone and Post-it notes to set reminders to take medications and to take care of personal needs and grooming.  (Tr. 550.)  She prepared dinner daily, and it took an hour or more.  (*Id.*)  She only had energy to prepare one meal a day.  (*Id.*)  She dusted, washed the dishes with breaks, and did laundry, but her children carried the laundry baskets for her.  (*Id.*)  Doing dishes took a couple of hours and laundry took all day.  (*Id.*)  She needed encouragement to do these things because many days she had no energy to move.  (*Id.*)

Ms. Childress sat outside in her backyard daily.  (Tr. 551.)  When going out, she drove or rode in a car.  (*Id.*)  She did not go out alone because she had anxiety with people.  (*Id.*)  She

went shopping for groceries in stores weekly for about an hour.  (*Id.*)  She could pay bills, count change, and use a checkbook/money order, but she could not handle a savings account because her mind "plays tricks" and she made many financial mistakes.  (*Id.*)  Her ability to handle money had changed since the onset of her conditions because she became confused and needed to remember to do her book twice.  (Tr. 552.)

Ms. Childress's hobbies and interests included movies and reading, but she could no longer retain what she read or watched.  (*Id.*)  She tried to read daily to keep her mind sharp.  (*Id.*)  She did not spend time with others or go places regularly because she had anxiety with crowds or groups of people.  (*Id.*)  She did not have problems getting along with friends and neighbors.  (Tr. 553.)  Since the onset of her conditions, she felt very uncomfortable around people with whom she was once comfortable.  (*Id.*)

Ms. Childress was limited by her conditions in lifting, squatting, bending, standing, walking, sitting, kneeling, talking, stair climbing, seeing, memory, completing tasks, concentrating, understanding, following instructions, using her hands, and getting along with others.  (*Id.*)  She could lift up to 35 pounds, but physical activities were extremely painful due to joint pain.  (*Id.*)  She was right-handed.  (*Id.*)  She could walk 200 feet before needing to stop and rest for "a minute or so."  (*Id.*)  The length of time she could pay attention depended on the day, and she finished what she started.  (*Id.*)  She needed written rather than spoken instructions.  (*Id.*)

Ms. Childress got along fine with authority figures and had never been fired because of problems getting along with others.  (Tr. 554.)  She did not handle stress or changes in routine well.  (*Id.*)  She feared people, crowds, driving, and being alone.  (*Id.*)  She used a cane and glasses.  (*Id.*)  She needed glasses all the time and the cane when her balance was "off."  (*Id.*)

21

Ms. Childress took several medications that caused side effects. (Tr. 555.) Gabapentin, trazodone, olanzapine, and topiramate caused drowsiness and dizziness; hydroxychloroquine and metoprolol caused dizziness; and duloxetine caused drowsiness. (*Id.*) Ms. Childress also experienced: vertigo that caused issues with balance; numbness of feet and hands that caused falling and dropping things; and arm and hip pain that was "at times unbearable." (*Id.*)

**D.     Hearing Testimony**

**1.     Plaintiff's Testimony**

**i.     November 23, 2020**

At a telephonic hearing on November 23, 2020, Ms. Childress testified in response to questioning by the ALJ and her attorney. (Tr. 99-107.) She said she was disabled due to heart issues that caused stress, which triggered other ailments, including fibromyalgia, arthritis, anxiety, and depression. (Tr. 100.) She had not worked since the alleged onset date of February 28, 2018. (*Id.*)

On a typical day, Ms. Childress woke up, drank coffee, took her medicine, then sat in a recliner and waited for the medication to work and her pain to lessen. (Tr. 102.) She tried to tidy the kitchen by putting dishes in the dishwasher, but she needed to rest and nap for one to three hours. (*Id.*) If she was having a "flare" she did not get up. (Tr. 102-03.) Flares could last from three days to a week and seemed to be triggered by stress. (Tr. 103.)

Ms. Childress lived with her teenage son and daughter. (Tr. 103.) Her son cooked and her daughter did some baking with direction from Ms. Childress. (Tr. 103-04.) The children did laundry because numbness in her feet prevented Ms. Childress from going downstairs; she had fallen up and down the stairs too many times and stopped using them. (Tr. 104.) She could fold clothes if they were brought upstairs, but it took her a while. (*Id.*) She had groceries delivered

because she tried not to leave the house. (*Id.*) When the weather was nice, she walked outside in the backyard with the dog for maybe ten minutes at a time. (Tr. 104-05.) Sometimes she used a cane because her hips and knees were in a lot of pain. (Tr. 105.) It was not prescribed, but she used it to take weight off her left hip when not in the house. (*Id.*) In the house, she held onto counters and walls to steady herself. (*Id.*)

The last time Ms. Childress left the house was two or three weeks prior for a doctor's appointment. (*Id.*) Her friend took her to the store about a month prior, but it was not a good experience. (Tr. 105-06.) There were too many people and too much going on in the store, and Ms. Childress did not "do well in that situation anymore." (Tr. 106.) Ultimately, Ms. Childress said she wanted to leave and went back to the car. (*Id.*)

Her cardiologist told her she could not lift more than 30 pounds. (*Id.*) She could be on her feet 10-15 minutes before needing to sit due to pain in her joints, and she could not sit for long periods. (Tr. 107.) Standing still made her back and hips hurt. (*Id.*) The best place to sit was a recliner because it put the least weight on her joints. (*Id.*)

### ii. April 4, 2022

Plaintiff testified at a video hearing on April 4, 2022, in response to questions from the ALJ and her attorney. (Tr. 68-79.) She said she was not able to work due to vertigo, pain from sitting, issues with her hands and feet (dropping things, stumbling), and problems with her hip and back that made sitting and standing an issue. (Tr. 69.)

Ms. Childress was always fidgeting while sitting due to constant pressure and pain in her left hip and could sit for 20-25 minutes before needing to stand. (Tr. 70-71.) She could stand for 5-25 minutes if she had something to lean on like cabinets, counters, or her cane. (Tr. 71.) She could walk about 75-350 feet with support but only 20 feet without support. (Tr. 72.) Due to

neuropathy in her feet, she could not drive when having a "flare." (*Id.*) She had flares two or three times a month that lasted two to five days. (Tr. 73.)

Ms. Childress could not lift more than 20 pounds. (Tr. 73.) She could rarely walk up and down stairs and went down more often than up. (Tr. 73-74.) She went to the basement, using the handrail, once or twice every two weeks. (Tr. 74.)

Ms. Childress lived with her son, daughter, and mother. (*Id.*) Everyone helped with chores. (Tr. 75.) Ms. Childress fed the cat, folded laundry once it was upstairs, and went grocery shopping with her daughter; she did not leave the house alone due to anxiety about people and noise. (Tr. 74-75.) She acknowledged that she went to the dentist alone a week before the hearing and sometimes attended doctor's appointments alone if it was a doctor she knew well. (Tr. 75.) If she had to see a new doctor or go to a new location, her sister took her and stayed with her through the appointment. (*Id.*)

At the grocery store, Ms. Childress used the cart as a walker. (Tr. 76.) She interacted with cashiers because she knew "pretty much everyone that works at Heinen's." (*Id.*) She could count change but sometimes forgot things due to "fibro fog," which was why she did not go places alone. (*Id.*) Once she was on her way to a doctor's appointment and forgot where she was going. (*Id.*) She went to a CVS parking lot and looked through her phone calendar to remind herself. (*Id.*) She then canceled the appointment and went home. (*Id.*) She had canceled a few rheumatology appointments and a heart appointment due to fog and being unable to get out of bed due to a "flare" day. (77.) She had "flares" randomly, sometimes none for a month then three the next month. (*Id.*) She and her doctors could not find a trigger. (*Id.*)

On a typical day, Ms. Childress passed the time journaling or doing an audio journal because holding pens and pencils was difficult with neuropathy. (*Id.*) She had "twitches." (*Id.*)

24

She explained that the inside of her body felt like "an electric fence" and sometimes "it escape[d] through her extremities." (Tr. 77-78.) It caused her fingers to "jump," and she would drop things. (Tr. 78.) In addition to pens, she had trouble holding a glass or her phone. (*Id.*) She experienced trouble holding things all the time. (*Id.*)

       **iii.**       **August 21, 2023**

On August 21, 2023, Ms. Childress again testified at a video hearing. (Tr. 44-55.) She had stopped working due to her cardiac issues and stress. (Tr. 50-51.) She could lift a box of kitty litter but was not sure how much it weighed. (Tr. 51-52.) She could use stairs to go into the basement by holding the handrails, but she tried not to do it more than once a day. (Tr. 52.) She could walk to the restroom and back and maybe farther depending on the situation. (*Id.*)

Ms. Childress did her own grocery shopping and said it was easier to walk around the store when she had a buggy to use as a walker. (Tr. 52-53.) She did not go to the store alone; her daughter came with her. (Tr. 53.) She tried not to go anywhere alone in case she experienced symptoms without warning. (*Id.*) She left her house a couple of times a week, planning outings so she could get groceries and prescriptions at one time. (Tr. 55.) She did not always attend her medical appointments because she sometimes did not feel safe to drive due to dozing off or feeling dizzy and lightheaded. (*Id.*) The frequency of her dizziness varied; sometimes it would last for a week and other times only three or four days a month. (*Id.*)

Ms. Childress lived with her mother and daughter. (Tr. 53.) They shared making meals, doing laundry, and cleaning the house. (*Id.*) Ms. Childress could dust, but she did not do large loads of laundry; dishes and cooking were a challenge because they required standing. (Tr. 54.) She could stand for 15-20 minutes at a time and could not sit comfortably in one position due to pain in her lower back. (*Id.*)

25

###### 2.       Medical Expert Testimony

At the hearing on April 4, 2022, Steven L. Schilling, M.D., testified as an impartial medical expert.  (Tr. 79-87.)  Dr. Schilling specializes in cardiology.  (Tr. 1748-51.)  Based on his review of the medical records, he testified that Ms. Childress presented with the rare condition "SCAD" and a mild aortic root enlargement.  (Tr. 80-81.)  He did not believe she had a condition or combination of conditions that met or equaled a Listing.  (Tr. 81.)

Dr. Schilling noted many rheumatology treatment records that discussed related diagnoses but said that it was "was outside [his] area of expertise."  (Tr. 82.)  Similarly, he "deferred to the appropriate expert" regarding Ms. Childress's psychological and psychiatric issues.  (*Id.*)  He did note that Ms. Childress's records indicated an anxiety component, and that anxiety is a significant factor with SCAD patients in his experience because the disease is extremely rare, poorly understood, and unpredictable.  (*Id.*)

Dr. Schilling provided an RFC assessment "primarily from a cardiovascular point of view."  (Tr. 82-83.)  He opined that Ms. Childress could stand/walk four hours in an eight-hour workday.  (Tr. 84.)  She could lift from 20 to 35 pounds but needed to avoid "repetitive isometric work" in terms of overall weightlifting.  (Tr. 85.)  Based on her two stress tests in the record, he opined that aerobic activity was okay, at least up to the level she reached during those tests.  (*Id.*)

Upon questioning by Plaintiff's attorney, Dr. Schilling testified that it was difficult to factor Ms. Childress's neuropathy symptoms into his RFC assessment, noting that there were "clearly other symptoms and issues in this file that [were] difficult . . . to associate with an objective finding."  (Tr. 86.)  He stated that he was not a specialist in neuropathy, rheumatology, or mental health and deferred to experts in those fields regarding limitations suggested by any symptoms or impairments in those categories.  (Tr. 86-87.)

### 3.      Vocational Expert's Testimony

A Vocational Expert ("VE") testified on August 21, 2023.  (Tr. 56-63.)  The VE testified that a hypothetical individual of Plaintiff's age, education, work experience, with the functional limitations described in the ALJ's RFC determination could not perform Ms. Childress's past relevant work, but could perform representative positions in the national economy, including cashier and order caller.  (Tr. 56-59.)  If the individual were also limited to frequent exposure to extreme heat, cold, and humidity, it would not change the VE's testimony.  (Tr. 60.)  The VE also testified that it would preclude competitive employment if the person would either be off task more than 15% of the time or absent more than two days a month.  (Tr. 62-63.)

In response to questions from Plaintiff's attorney, the VE testified that it would not change his opinion if the individual were further limited to occasional climbing of ramps and stairs and occasional exposure to heat, cold, and humidity.  (Tr. 60-61.)  If the hypothetical individual could stand or walk less than four hours in an eight-hour workday, it would reduce the RFC to sedentary, and there would be other jobs available, including charge account clerk, food and beverage order clerk, and document preparer.  (Tr. 61.)  If the person were further limited to occasional interaction with the public, it would exclude charge account clerk, but the other two sedentary positions would remain available.  (Tr. 61-62.)  If the ALJ's original hypothetical were changed to allow for only occasional interaction with the public, it would eliminate the cashier position but not the order caller job.  (Tr. 62.)  Need for a cane or walker would reduce the exertional level to sedentary.  (*Id.*)  If the hypothetical individual needed to sit in a reclined position to elevate their legs to at least knee level or higher, that would not be consistent with competitive employment; it would require "a major employer accommodation."  (Tr. 63.)  A need for regular unscheduled breaks would only be tolerated if the breaks lasted no more than

27

five minutes.  (*Id.*)  If the hypothetical individual needed six to eight redirections daily beyond a probationary period, that worker would not be able to sustain employment.  (*Id.*)

### III.  Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is

28

capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy.  *Id.*

### IV.    The ALJ's Decision

In her October 31, 2023 decision, the ALJ made the following findings:[4]

1.    The claimant meets the criteria for eligibility requirements to apply Medicare only as a "Medicare qualified government employee" under 42 C.F.R. § 406.15, through September 30, 2022.  (Tr. 20.)

2.    The claimant has not engaged in substantial gainful activity since February 28, 2018, the alleged onset date.  (*Id.*)

3.    The claimant has the following severe impairments: chronic ischemic heart disease, disorder of the aortic valve, disorder of the thyroid, rheumatoid arthritis, and depressive disorder.  (*Id.*)

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 21.)

5.    The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(a) except: The claimant can lift and carry up to 10 pounds frequently and 20 pounds occasionally.  She can stand or walk four hours in an eight-hour day.  She can frequently climb ramps and stairs, but can never climb ladders, ropes, or scaffolds. She can frequently balance and occasionally stoop, kneel, crouch, or crawl.  She should avoid jobs that require frequent exposure to respiratory irritants such as smoke, fumes, pollutants, and dust.  She should avoid work operating dangerous machinery and unprotected heights.   The claimant can: understand, remember, and carry out simple instructions; respond appropriately to supervision, coworkers, and usual work situations; deal with change in routine work settings; focus attention on simple or routine work for at least

---

[4] The ALJ's findings are summarized.

two hours at a time; and stay on task at a sustained rate.  She can also work at an appropriate and consistent pace; complete tasks in a timely manner; ignore or avoid distractions while working; change activities or work settings without being disruptive; and perform work tasks that do not have high production quotas or hourly piece rate work.  (Tr. 22-23.)

6. The claimant is unable to perform any past relevant work.  (Tr. 32.)

7. The claimant was born in 1973 and was 44 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  She reached age 50 on September 22, 2023 and entered the closely approaching advanced age category.  (*Id.*)

8. The claimant has at least a high school education.  (*Id.*)

9. Transferability of job skills is not material to the determination of disability.  (*Id.*)

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including cashier and order caller.  (Tr. 32-33.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from February 28, 2018, through the date of the decision on October 31, 2023.  (Tr. 33.)

## V.     Plaintiff's Arguments

Plaintiff raises three assignments of error: (1) the ALJ committed an error of law by not designating peripheral neuropathy, anxiety, and PTSD as severe impairments (ECF Doc. 11, pp. 19-21); (2) the ALJ erred in evaluating the persuasiveness of Ms. Childress's treating providers' opinions (*id.* at pp. 21-25); and (3) the ALJ failed to comply with SSR 98-6p when determining the RFC, and the RFC is not supported by substantial evidence (*id.* at pp. 25-28).

# VI.    Law & Analysis

## A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.    First Assignment of Error: The ALJ's Failure to Designate Peripheral Neuropathy, Anxiety, and/or PTSD as Severe Impairments Was Not Harmful Error**

In her first assignment of error, Plaintiff argues that the ALJ erred by not finding that peripheral neuropathy, anxiety, and PTSD were severe impairments at Step Two of the sequential analysis.  (ECF Doc. 11, pp. 19-21.)  The Commissioner responds that the ALJ appropriately considered each of the three conditions.  (ECF Doc. 13, pp. 9-11.)

### 1.    Legal Standard for Step Two Determinations

At Step Two of the sequential analysis, the claimant bears the burden to show "a severe medically determinable physical or mental impairment" or combination of impairments that meet specified duration requirements.  20 C.F.R. § 416.920(a)(4)(ii).  A medically determinable impairment ("MDI") is an impairment that results from "anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 416.921.  Under the applicable regulations, an MDI may

only be "established by objective medical evidence from an acceptable medical source," and not by a "statement of symptoms, a diagnosis, or a medical opinion" alone.  *Id.*

Once an MDI has been established, the analysis turns to whether it is "severe."  20 C.F.R. § 416.921.  The claimant bears the burden to prove the severity of her impairments.  *Foster v. Sec'y of Health & Hum. Servs.,* 899 F.2d 1221, at *2 (6th Cir. 1990) (unpublished table decision) (citing *Murphy v. Sec'y of Health & Hum. Servs.*, 801 F.2d 182, 185 (6th Cir. 1986)).  A "severe" impairment is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1520(c)); *see also Long v. Apfel*, 1 F. App'x 326, 330-32 (6th Cir. 2001).  In contrast, an impairment is "non-severe" if it "does not significantly limit [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1522(a).

The Sixth Circuit has construed Step Two as a de minimis hurdle, explaining that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  "The goal of the test is to 'screen out totally groundless claims.'"  *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (*quoting Farris v. Sec'y of Health & Hum. Servs.*, 773 F.2d 85, 89 (6th Cir.1985)).  Although the standard is de minimis, it is recognized that a diagnosis alone "says nothing about the severity of the condition."  *Higgs*, 880 F.2d at 863; *see also Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("The mere existence of those impairments, however, does not establish that [claimant] was significantly limited from performing basic work activities for a continuous period of time.").

33

In *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240 (6th Cir. 1987), the Sixth Circuit held that it is not reversible error for the Commissioner to deem an impairment "non-severe" when other impairments have been found "severe," since non-severe impairments are also considered in assessing the RFC. *See id.* at 244; *see also Anthony*, 266 F. App'x at 457 (finding it "legally irrelevant" that some impairments were not deemed severe because the ALJ could consider "severe and non-severe impairments in the remaining steps of the sequential analysis"); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) (finding "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence" when the ALJ found a severe impairment).

Conversely, an ALJ's explicit decision not to consider a non-severe impairment in assessing the RFC has been found to be reversible error. *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 190-191 (6th Cir. 2009) (distinguishing *Maziarz* and finding reversible error when an ALJ found a non-severe mental impairment "would not be considered in assessing her RFC"); *cf. Pompa*, 73 F. App'x at 803 (finding harmless error where the "ALJ considered all of [plaintiff]'s impairments in her residual functional capacity assessment").

More recently, in *Napier v. Comm'r of Soc. Sec.*, 127 F.4th 1000 (6th Cir. 2025), the Sixth Circuit considered a challenge to an ALJ's Step Two findings without applying a harmless error analysis. Instead, the *Napier* court applied a substantial evidence analysis in assessing whether the ALJ erred in finding mental impairments non-severe at Step Two, or by failing to incorporate mental limitations into the RFC at Step Four. *Id.*

Plaintiff challenges the ALJ's failure to designate peripheral neuropathy, anxiety, and PTSD as severe MDIs. (ECF Doc. 11, pp. 19-21.) The Court will address the physical and mental impairments in turn.

34

2. **The ALJ Did Not Err and Was Supported by Substantial Evidence When She Did Not Deem Peripheral Neuropathy a Severe MDI**

Plaintiff argues "it was clearly established by the medical record" that her peripheral neuropathy was a severe impairment, and that the ALJ's failure to deem it "severe" deprives her findings of the support of substantial evidence. (ECF Doc. 11, pp. 20-21.) The Commissioner argues in response that peripheral neuropathy was not established to be an MDI at all, let alone a severe MDI, and that the ALJ was therefore not required to consider it in her decision. (ECF Doc. 13, p. 9.) In reply, Plaintiff highlights medical records showing that she suffered symptoms consistent with peripheral neuropathy even after that condition was ruled out by clinical testing, arguing "[a]t minimum, [Plaintiff] clearly suffers from neuropathic conditions" and that "the ALJ failed not only to include peripheral neuropathy as an MDI, but also failed to consider [Plaintiff]'s neuropathic symptoms and limiting effects[.]" (ECF Doc. 14, pp. 3-4.)

To support a finding that peripheral neuropathy is an MDI, the evidence must show the impairment was "established by objective medical evidence from an acceptable medical source," including "anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.921. Plaintiff does not identify objective evidence in the form of "medically acceptable clinical and laboratory diagnostic techniques" to demonstrate that her peripheral neuropathy was an MDI; instead, she cites medical evidence of symptoms that could be consistent with peripheral neuropathy, like weakness, numbness, burning, tingling, and paresthesia. (ECF Doc. 11, p. 20.) In contrast, the Commissioner specifically points to a July 2019 EMG that "yielded no evidence of peripheral neuropathy" in support of an argument that "the medical evidence does not establish it as an MDI." (ECF Doc. 13, p. 9 (citing Tr. 1700); *see* Tr. 1700 (finding "no electrodiagnostic evidence of nerve entrapment or peripheral neuropathy").) Indeed, the ALJ

35

referenced these same clinical findings in the context of allegations of neuropathy, explaining: "Claimant's representative asked the medical expert if he factored in neuropathy in feet and the hands. Dr. Shilling said studies of left arm and leg in June 2019 were normal."  (Tr. 27.)

While Plaintiff acknowledges the normal EMG findings in her reply brief, she does not identify other objective findings to support a finding that her peripheral neuropathy was an MDI; instead, she continues to rely on records indicating that she suffered from symptoms consistent with peripheral neuropathy and argues generally that she "suffers from neuropathic conditions." (ECF Doc. 14, p. 3.)  Since an MDI may not be established by a "statement of symptoms, a diagnosis, or a medical opinion" alone, *see* 20 C.F.R. § 416.921, Plaintiff has not met her burden to show that the ALJ erred when she did not find peripheral neuropathy to be a severe MDI.

Turning to Plaintiff's assertion in her reply brief that the ALJ "also failed to consider [her] neuropathic symptoms and limiting effects" (ECF Doc. 14, p. 4), the Court observes that arguments raised for the first time in a reply brief are waived.  *Stewart v. IHT Ins. Agency Grp., LLC*, 990 F.3d 455, 457 (6th Cir. 2021) ("[E]ven well-developed arguments raised for the first time in a reply brief come too late.").  Moreover, a review of the ALJ's written decision reflects that she both acknowledged and considered the symptoms and complaints tied to Plaintiff's peripheral neuropathy arguments.  (*See, e.g.,* Tr. 24 ("numbness in her hands"); Tr. 26 ("weak grip in both hands"); *id*. ("stiffness and pain in her wrists, hands, and knees").)  The ALJ's discussion of the subjective complaints and medical findings suggests that she considered the relevant symptoms in the context of Plaintiff's cardiac and rheumatoid impairments, which the ALJ found severe MDIs at Step Two.  (*See* Tr. 20, 26-27.)  Thus, even if Plaintiff's symptom-based challenge were properly before the Court, she has not shown that the ALJ failed to properly consider the relevant symptoms in her RFC analysis.  *See generally Pompa,* 73 F.

App'x at 803 (finding harmless error where the "ALJ considered all of [plaintiff]'s impairments in her residual functional capacity assessment").

For the reasons set forth above, the Court finds Ms. Childress has not met her burden to show that the ALJ erred when she did not find "peripheral neuropathy" to be a severe MDI at Step Two, or that the ALJ's Step Two findings as to Plaintiff's physical impairments otherwise lacked the support of substantial evidence.

### 3. The ALJ Did Not Commit Harmful Error When She Found One Severe Mental Impairment but Did Not Designate Anxiety and PTSD as Severe

Plaintiff next argues that the ALJ erred by "omitt[ing] both anxiety and post-traumatic stress disorder as severe impairments" while finding depressive disorder to be a severe MDI. (ECF Doc. 11, p. 21.) She argues that the medical evidence shows she suffered symptoms resulting from both anxiety and PTSD, and that those impairments caused "more than a slight abnormality in her ability to perform basic work activities." (*Id*.) The Commissioner responds that "there is no reversible error" in this case because "the ALJ found that Plaintiff had a severe mental impairment (i.e., depressive disorder) and considered the cumulative effects of Plaintiff's impairments when determining the RFC." (ECF Doc. 13, p. 10.) In her reply brief, Plaintiff argues that this analysis is incorrect because her anxiety and PTSD "manifest with different symptoms and functional limitations" than her depressive disorder. (ECF Doc. 14, p. 4.)

"[W]hen an ALJ determines that one (or more) of a claimant's impairments is severe," the Sixth Circuit has explained that the ALJ is still required to "consider the limitations and restrictions imposed by all of [the] individual's impairments, even those that are not severe." *Kestel v. Comm'r of Soc. Sec.*, 756 F. App'x 593, 597 (6th Cir. 2018) (quoting *Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007) and Soc. Sec. Rul. 96–8p) (internal quotation marks omitted). And because an ALJ must still consider "all of a claimant's impairments in the

remaining steps of the disability determination," regardless of severity, the Sixth Circuit has repeatedly held that "any perceived failure to find additional severe impairments at step two does not constitute reversible error." *Kestel*, 756 F. App'x at 597 (quoting *Fisk*, 253 F. App'x at 583 and *Maziarz*, 837 F.2d at 244) (internal quotation marks and brackets omitted).

In contrast, the Sixth Circuit *has* found reversible error when an ALJ clearly failed to consider a non-severe impairment in the remaining steps of the disability determination. *See Simpson,* 344 F. App'x at 190–191. Thus, Sixth Circuit precedent indicates that Plaintiff cannot demonstrate harmful error warranting remand simply by showing that her anxiety and PTSD could have been deemed "severe" MDIs. Instead, she must show both that the evidence required a finding that they were MDIs and that ALJ failed to consider those MDIs in the remaining steps of the disability determination. As discussed in further detail below, a review of the ALJ's written decision shows that she appropriately considered all of Plaintiff's mental impairments in her analysis of the remaining steps of the sequential analysis.

At Step Two, the ALJ found "depressive disorder" to be a severe impairment which "significantly limit[ed] [Plaintiff's] ability to perform basic work activities[.]" (Tr. 20.) At Step Three, she found Plaintiff had the following limitations in the four areas of mental functioning:

> In understanding, remembering, or applying information, the claimant has a moderate limitation. In an Adult Function Report, the claimant indicated that she enjoys movies and reading but struggles to retain what she has seen or read []. Claimant also stated that she cannot follow spoken instructions but does not have problems with written instructions []. At two different consultative examinations, the claimant reported that she had no learning problems []. The examiner noted that the claimant had normal cognitive functioning [].

> In interacting with others, the claimant has a mild limitation. In an Adult Function Report, the claimant indicated anxiety with groups and crowds []. She stated that she feels very uncomfortable around people []. During a consultative examination, the claimant reported being scared of people and not wanting to leave the house []. She stated that her anxiety has caused her to "not like people" []. However, Claimant showed good rapport with providers and good interactions with staff.

> With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. In an Adult Function Report, the claimant indicated that her attention span varies []. She does not handle stress or changes in her routine well []. During consultative psychological examinations, there was no evidence that the claimant struggles with concentration or attention [].
>
> As for adapting or managing oneself, the claimant has experienced a moderate limitation. In an Adult Function Report, the claimant indicated that she has no problems taking care of her personal needs []. Claimant cooks every day and is able to do housework []. She goes grocery shopping and is able to manage her own finances, even though her "mind plays tricks" []. During a consultative examination, the claimant reported problems sleeping but she was able to take care of her personal needs, such as hygiene and eating []. She also stated that she tries to do household chores but attributed any shortcomings to her physical ailments []. At another consultative examination, the claimant stated that there are times when she is unable to get out of bed or take care of her household []. Claimant showed adequate hygiene at both consultative psychological examinations []. In May 2023, claimant was involved in care of their mother, who lives with claimant and has a number of physical limitations [].

(Tr. 21-22 (emphasis added) (citations omitted).)  Thus, the ALJ explicitly considered Plaintiff's reported anxiety and discomfort around people in assessing her mental functioning.

At Step Four, the ALJ considered Plaintiff's subjective complaints of "mental issues, including anxiety attacks," but found that her statements regarding the intensity, persistence, and limiting effects of her symptoms "were not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 23-24.)  In support, the ALJ provided a detailed summary of the medical records, in which she specifically noted the following:

- "[A]nxiety related symptoms, which she thought were cardiac symptoms" and apparent "physical manifestations of anxiety" that included "hyperventilation and numbness, with swelling" during cardiac treatment (Tr. 24 (citing Tr. 1081);

- Chest pain and other cardiac symptoms that she "wondered if [they] [were] due to anxiety" (Tr. 25 (citing Tr. 1538-41, 1832-35));

- Anxiety related to her heart condition, which manifested as physical symptoms mimicking heart attack symptoms (Tr. 27-29 (citing Tr. 1020-29, 1044, 1369));

- Mental status examinations showing normal mental functioning despite symptoms of anxiety/depression (*id.* (citing Tr. 1369-72, 1375-77, 1379-81, 1678, 2296-300));

39

- Repeated reports of seasonal depression, discomfort going out in public, and lack of motivation (*id.* (citing Tr. 1379, 1677, 1733));

- Multiple adjustments in medication to treat anxiety and depression symptoms, with varying degrees of success (*id.* (citing Tr. 1369-72, 1375-77, 1379-81, 1677-80)); and

- Plaintiff's rejection of psychotherapy to treat anxiety and depression (*id.* (citing Tr. 2010-12)).

At one point, the ALJ noted that Plaintiff "was diagnosed with anxiety disorder due to a medical condition/major depression," but said "[i]t is unclear if this is one or two diagnoses." (Tr. 28.) The ALJ also considered two consultative psychological examination reports from Dr. Whitlow. (Tr. 29.) In the first, the ALJ highlighted Dr. Whitlow's observations that Plaintiff "reported ongoing anxiety after experiencing her spontaneous artery dissections" and "attributed all of her mental health related symptoms to anxiety about her physical health," but "showed no signs of anxiety during the evaluation." (*Id.* (citing Tr. 1020-28).) She noted that Dr. Whitlow diagnosed adjustment disorder with anxiety and depressed mood. (*Id.*) In the second examination, the ALJ highlighted Dr. Whitlow's observations that Plaintiff complained of anxiety and depression, reported ongoing psychiatric treatment for anxiety and depression, and appeared nervous on examination. (*Id.* (citing Tr. 1578-89).) She also noted Dr. Whitlow's diagnoses of major depressive disorder, generalized anxiety disorder, and agoraphobia with panic symptoms. (*Id.*)

The ALJ also considered medical opinions relating to Plaintiff's mental functioning, including the opinions of the state agency psychiatric consultants, consultative examiner Dr. Whitlow, and treating provider CNP Raimey. (Tr. 30-31.) In particular, the ALJ noted Dr. Whitlow's October 2019 opinion that "claimant's anxiety would interfere with her ability to put herself in an environment in which she can carry out necessary or assigned tasks" and generally found Dr. Whitlow's opinion "more consistent with the evidence" which "shows ongoing physical manifestations of anxiety that the claimant mistakes for cardiac problems." (Tr. 30.)

40

Based on the medical records and opinions, the ALJ adopted the following mental RFC:

The claimant can understand, remember and apply information to complete simple instructions and perform routine tasks, meaning that the claimant has the basic mental aptitude to meet the demands of competitive, remunerative unskilled work, including the ability to (on a sustained basis) understand, remember and carry out simple instructions; can respond appropriately to supervision, coworkers and usual work situations. The claimant can deal with changes in routine work settings; can focus attention on simple or routine work activities for at least 2 hours at a time and stay on task at a sustained rate such as initiating and performing a task that they understand and know how to do. Claimant can work at an appropriate and consistent pace; can complete tasks in a timely manner; can ignore or avoid distractions while working; can change activities or work settings without being disruptive; can perform work tasks that do not have high production quotas or hourly piece rate work.

(Tr. 22-23.)

A review of the ALJ's written decision thus reveals that she considered Plaintiff's complaints of anxiety, including reported fear of people and discomfort going out in public (Tr. 21-22, 28-29), but also considered her mental status findings (Tr. 27-29), good rapport with providers and staff (Tr. 22), and medical opinions finding she had no or mild-moderate limitations in interacting with others (Tr. 30-31), before concluding that Plaintiff had moderate limitations in three areas of functioning but mild limitations in interacting with others (Tr. 21-22) and adopting an RFC finding Plaintiff able to complete simple instructions and perform routine tasks without high production quotas or hourly piece rate work (Tr. 22-23).  In this context, the Court concludes that the ALJ considered all of Plaintiff's mental impairments at Steps Three and Four of the sequential analysis, and that "any perceived failure to find additional severe impairments at step two does not constitute reversible error."  *Kestel*, 756 F. App'x at 597 (quoting *Fisk*, 253 F. App'x at 583 and *Maziarz*, 837 F.2d at 244).

Plaintiff's assertion in her reply brief that her anxiety and PTSD "manifest with different symptoms and functional limitations" from her depressive disorder, interfering with her ability to leave home and interact with others, does not change this Court's analysis.  (ECF Doc. 14, pp. 4-

41

5.)  As noted above, the ALJ acknowledged Plaintiff's complaints regarding difficulty leaving home and interacting with others but still concluded based on the complete record that Plaintiff had no more than mild limitations in interacting with others.  Plaintiff has not shown that this finding lacked the support of substantial evidence, and "'the substantial evidence standard presupposes that there is zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at 545).

For the reasons set forth above, the Court finds Plaintiff has not shown that the ALJ's failure to designate anxiety and PTSD as "severe" impairments amounted to harmful error, since the ALJ found a severe mental impairment at Step Two and appropriately considered all of Plaintiff's mental impairments in the remaining steps of the disability determination. Accordingly, the Court finds Ms. Childress's first assignment of error to be without merit.

## C.  Second Assignment of Error: The ALJ Did Not Err in Evaluating the Persuasiveness of the Treating Providers' Medical Opinions

In her second assignment of error, Plaintiff argues that the ALJ erred in evaluating the persuasiveness of the medical opinions of her treating providers Dr. Samsa, CNP Raimey, and Dr. Gornik.  (ECF Doc. 11, pp. 21-25.)  The Commissioner responds that substantial evidence supports the ALJ's evaluation of the medical opinion evidence.  (ECF Doc. 13, pp. 11-14.)

### 1.  Framework for the Evaluation of Medical Opinion Evidence

The regulations governing the evaluation of medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)."  20 C.F.R. § 416.920c(a).  Those five factors include supportability, consistency, relationship with the claimant, specialization, and other factors; but the most important factors are supportability and consistency.  20 C.F.R. §§ 416.920c(a), 416.920c(b)(2), 416.920c(c)(1)-

(5).  ALJs must therefore explain how they considered consistency and supportability but need not explain how they considered other factors.  20 C.F.R. § 416.920c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record.

In reviewing an ALJ's medical opinion analysis, courts must consider whether the ALJ: considered the full record in assessing the persuasiveness of the opinion; appropriately articulated his reasons for finding the opinion unpersuasive; and made findings supported by substantial evidence.  *See* 20 C.F.R. § 416.920c (governing how ALJs consider and articulate findings re: medical opinions); 20 C.F.R. § 416.920(e) (findings re: RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405.

### 2.     Plaintiff Has Not Met Her Burden to Show That the ALJ Erred in Evaluating the Persuasiveness of the Treating Providers' Medical Opinions

Plaintiff argues that the ALJ erred when she found the opinions of her treating providers Dr. Samsa, CNP Raimey, and Dr. Gornik not persuasive or partially persuasive, while finding

the opinions of the state agency medical consultants mostly persuasive. (ECF Doc. 11, pp. 21-22.) Specifically, she argues that: the ALJ used "inconsistent" reasoning in analyzing Dr. Samsa's opinion (*id.* at p. 23); the treating providers' medical opinions should be found "mostly persuasive" in light of their treatment histories with Plaintiff (*id.* at p. 24); the treating opinions were consistent with one another and other evidence (*id.* at pp. 23-25); and the opinions should be "given greater weight" than the state agency opinions or given "deference" as the opinions of treating medical providers (*id.* at pp. 24-25). In her reply brief, she also asserts that the treating opinions were both consistent and supported by the record, and that the ALJ "failed to give good reasons to discount [the treating source] opinions[.]" (ECF Doc. 14, pp. 5-6.) The Court will address these arguments in turn, beginning with the arguments directed to all three opinions.

In response to Plaintiff's argument that the treating providers' opinions should have been found "mostly persuasive" based on their treatment history with Plaintiff (*id.* at p. 24), the Commissioner accurately observes that Plaintiff's brief does not specifically challenge the ALJ's analysis of supportability or consistency, instead arguing that "another, less important factor – the length and nature of the relationships between those medical sources and Plaintiff – should have directed" the ALJ's persuasiveness findings. (ECF Doc. 13, p. 12.) While the regulations do provide for ALJs to consider treating relationships among other factors when assessing the persuasiveness of a medical opinion, the regulations clearly state that the most important factors are supportability and consistency, and that ALJs need not explain how they considered any factors other than supportability and consistency. 20 C.F.R. §§ 416.920c(a), 416.920c(b)(2), 416.920c(c)(1)-(5), 20 C.F.R. § 416.920c(b)(2). Thus, the ALJ was not required to discuss how she considered Plaintiff's treating relationship with her providers in her analysis.

Further, Plaintiff has not identified evidence to support a finding that the ALJ failed to consider the treating relationships in her analysis of the relevant opinions.  Indeed, a review of the ALJ's written decision suggests just the opposite.  (*See, e.g.,* Tr. 24-25 (summarizing treatment visits with Dr. Gornik), Tr. 30 ("Dr. Samsa initially saw the claimant in June 2017 and the last office visit was in December 2017."), Tr. 31 ("I also note the lapse of time between the last time Nurse Raimey saw the claimant and the time she completed this form. The form was completed in September 2020 and was completed approximately 10 months after Nurse Raimey last saw the claimant in November 2019."), *id.* ("Nurse Raimey had not personally seen the claimant for over one year when she completed this questionnaire. She also indicated she sees the claimant twice a year. The infrequency of the contact with the claimant and the lapse of time means Nurse Raimey's opinions are outdated and not based on current functioning.").  The Court accordingly finds that Plaintiff has not met her burden to show that the ALJ erred by failing to account for Plaintiff's treating relationships in her opinion analysis.

As to Plaintiff's argument that the treating opinions are consistent with one another (ECF Doc. 11, pp. 23-24), the Commissioner asserts that this argument is underdeveloped and unsupported, observing by way of example that Dr. Samsa's opinion assesses limitations based on Plaintiff's cardiac impairments while CNP Raimey's opinion assesses limitations based on Plaintiff's mental impairments (ECF Doc. 13, pp. 12-13).  In reply, Plaintiff acknowledges that the two providers assessed different impairments but argues that the opinions were nevertheless consistent with respect to their conclusions regarding her "inability to work, and inability to maintain persistence and concentration to task[s] while at work."  (ECF Doc. 14, p. 6.)

Ultimately, this Court need not determine whether the treating provider opinions are consistent with one another.  The question before this Court is whether the ALJ's evaluation of

each treating opinion complied with the regulations and was supported by substantial evidence. 20 C.F.R. §§ 416.920(e), 416.920c; *see also Blakley*, 581 F.3d at 405.  Even if certain opinions deemed "not persuasive" or "partially persuasive" had some consistency with one another, that alone is insufficient to deprive the ALJ's analysis of the support of substantial evidence.  Indeed, even if that consistency provided substantial evidence to support a finding that an opinion was more persuasive, this Court cannot overturn the ALJ's contrary finding "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.  Plaintiff has not shown that any consistency between the treating provider opinions deprives the ALJ's findings of the support of substantial evidence.

The same analysis applies to Plaintiff's more general arguments that the treating opinions were consistent with other evidence and supported by the record.  (ECF Doc. 11, pp. 23-25; ECF Doc. 14, pp. 5-6.)  The question before this Court is not whether substantial evidence would support a finding that the treating opinions were more persuasive.  The question is whether Plaintiff has shown that the ALJ's contrary findings lacked the support of substantial evidence. Since Plaintiff has simply identified evidence to support her preferred findings, without demonstrating that the ALJ's contrary findings lacked the support of substantial evidence, this argument does not support a finding that the ALJ erred.

As to Plaintiff's arguments that the treating provider opinions should be "given greater weight" or "deference" in comparison to other medical opinions (ECF Doc. 11, pp. 24-25), or that the ALJ "failed to give good reasons to discount [the treating source] opinions" (ECF Doc. 14, p. 6), those arguments must fail because they rely on standards only applicable under a prior, outdated version of the SSA regulations.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017) ("[W]e are not

retaining the treating source rule in final 404.1520c and 416.920c for claims filed on or after March 27, 2017."); *cf. Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) ("The Commissioner is required to provide 'good reasons' for discounting the weight given to a treating-source opinion.") (citing the prior regulations at 20 C.F.R. § 404.1527(c)(2)).

In addition to her general arguments regarding the ALJ's analysis of all three opinions, Plaintiff also offers more specific arguments regarding the ALJ's analysis of Dr. Samsa's medical opinion.  (ECF Doc. 11, p. 23.)  In assessing that opinion, the ALJ explained:

> John Samsa, DO, completed a cardiac questionnaire on September 10, 2018. Dr. Samsa initially saw the claimant in June 2017 and the last office visit was in December 2017. Claimant's diagnosis was spontaneous coronary artery dissection. Claimant was functional class III. Prognosis was fair. Dr. Samsa opined that the claimant was incapable of even "low stress work" and should avoid all exposure to extreme temperatures and pulmonary irritants. Claimant showed significant anxiety at the last exam and would be off task 25% or more of a typical workday. Dr. Samson also opined that the claimant would likely be absent from work more than four days each month due to her rare heart disorder. Claimant had been referred to a specialty clinic at the Cleveland Clinic (Exhibit 2F:3-6). <u>This opinion is not persuasive. Dr. Samsa last saw the claimant approximately 9 months before completing this form and based the answers on old information. This form was completed shortly after the alleged onset date and does not account for any later improvement</u>.

(Tr. 30 (emphasis added).)  Plaintiff argues that: the ALJ's "reasoning is inconsistent with itself" because she discounted Dr. Samsa's opinion as based on "old information" from 2017 while finding the testimony of Dr. Shilling persuasive despite his reliance on medical information from 2017 and 2018; and the ALJ discounted Dr. Samsa's opinion because it did not account for later improvement but "a significant improvement has not occurred."  (ECF Doc. 11, p. 23.)

As to Plaintiff's first argument, that the ALJ's reasoning is inconsistent because Dr. Shilling also considered "old evidence" and his opinion was found persuasive, the Court finds this comparison does not deprive the ALJ's findings of the support of substantial evidence.  First, Dr. Samsa provided an opinion as a treating provider, but admittedly had not seen his patient for

nine months at the time of the opinion; in contrast, Dr. Shilling testified as an "impartial medical expert" who based his opinion entirely on a review of the medical records.  (Tr. 27, 30.)  Second, the ALJ did not rely exclusively on the age of the underlying evidence to support her analysis of Dr. Samsa's opinion but also noted that the form was completed shortly after the alleged onset date and therefore did not account for "any later improvement" in the ensuing five years.  (Tr. 30.)  And third, the ALJ noted that Dr. Shilling "thoroughly reviewed the medical evidence of record at the time [of his April 2022 testimony] and explained the testimony."  (Tr. 27.)  Thus, Dr. Shilling's opinion was based on a thorough review of the medical records in evidence at the time of the April 2022 hearing, rather than only six months of treatment in 2017.

As to Plaintiff's second argument, that the ALJ erred in observing that Dr. Samsa's opinion "does not account for any later improvement" because "a significant improvement has not occurred," this argument also does not support a finding that the ALJ's analysis lacked the support of substantial evidence.  The ALJ summarized treatment records from 2017, when Plaintiff suffered a myocardial infarction, underwent a cardiac catheterization with placement of two stents, and was hospitalized for spontaneous dissections of her coronary artery.  (Tr. 24.)  She also summarized treatment records from 2018 through 2022, which reflected both periods of cardiac stability and another myocardial infarction and spontaneous dissection of her coronary artery in 2022.  (Tr. 24-25.)  Regardless of whether Plaintiff's cardiac impairments underwent "significant" or permanent improvement, there is substantial evidence to support a finding that the medical records show at least periods of "later improvement" sufficient to support a conclusion that a medical opinion based on the 2017 records alone is less persuasive than an opinion that takes into account the later treatment records as well.

For the reasons set forth above, the Court finds the ALJ adequately articulated the basis for her persuasiveness findings with respect to the treating medical opinions of Dr. Samsa, CNP Raimey, and Dr. Gornik, and further that Plaintiff has not met her burden to show that the ALJ's explanations or findings lacked the support of substantial evidence.  Accordingly, the Court finds Ms. Childress's second assignment of error is without merit

**D.    Third Assignment of Error: The ALJ Complied with SSR 96-8p and Appropriately Evaluated the Evidence in Formulating the RFC**

In her third assignment of error, Plaintiff asserts that the ALJ failed to comply with SSR 96-8p because she did not account for Ms. Childress's "physical and mental limitations, course and effects of treatment, medical source statements, and pervasive daily impacts . . . [and] failed to fully assess [Ms. Childress's] limitations caused by her physical and mental conditions, including their residual effects."  (ECF Doc. 11, p. 26.)  She further asserts that the RFC is not supported by substantial evidence because it does not contain certain specific limitations.  (*Id.* at pp. 26-27; ECF Doc. 14, p. 7.)  The Commissioner responds that the RFC is supported by substantial evidence.  (ECF Doc. 13, p. 14.)

A claimant's "residual functional capacity is the most [she] can still do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1).  "The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician."  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)); *see also id.* ("[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding.")  An ALJ must assess a claimant's "residual functional capacity based on all the relevant evidence in [the] case record," 20 C.F.R. § 404.1545(a)(1), such as: medical history; medical signs and laboratory findings; the effects of treatment; reports of daily activities; lay evidence; recorded observations;

49

medical source statements; effects of symptoms; evidence from attempts to work; need for a

structured living environment; and work evaluations, *see* SSR 96-8p, *Assessing Residual*

*Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34477 (July 2, 1996).

The claimant bears the burden to prove the residual functional capacity. *See Napier*, 127

F.4th at 1003 (stating the claimant bears the burden of proof in the first four steps of the

sequential analysis, while the burden shifts to the Commissioner at Step Five); *Her v. Comm'r of*

*Soc. Sec.*, 203 F.3d 388, 392 (6th Cir. 1999) (rejecting argument that the burden of proving the

RFC shifts to the Commissioner at Step Five).

Here, the ALJ found that Ms. Childress was able to perform work at the light exertional

level, with the following additional limitations:

> [C]laimant can lift and carry up to 10 pounds frequently and 20 pounds
> occasionally. Claimant can stand or walk 4 hours in an 8-hour day. Claimant can
> frequently use ramps and stairs, but never climb ladders, ropes, and scaffolds. The
> claimant can frequently balance and occasionally stoop, kneel, crouch, or crawl.
> Claimant should avoid jobs that require frequent exposure to respiratory irritants
> such as smoke, fumes, pollutants, and dust. The claimant should avoid work
> operating dangerous machinery and work tasks at unprotected heights. The
> claimant can understand, remember and apply information to complete simple
> instructions and perform routine tasks, meaning that the claimant has the basic
> mental aptitude to meet the demands of competitive, remunerative unskilled work,
> including the ability to (on a sustained basis) understand, remember and carry out
> simple instructions; can respond appropriately to supervisions, coworkers and usual
> work situations. The claimant can deal with changes in routine work settings; can
> focus attention on simple or routine work activities for at least 2 hours at a time and
> stay on task at a sustained rate such as initiating and performing a task that they
> understand and know how to do. Claimant can work at an appropriate and
> consistent pace; can complete tasks in a timely manner, can ignore or avoid
> distractions while working can change activities or work settings without being
> disruptive; can perform work tasks that do not have high production quotas or
> hourly piece rate work.

(Tr. 22-23.)  In support of this finding, the ALJ considered the relevant evidence and described:

Plaintiff's allegations of physical, social, and mental limitations (Tr. 21-22, 23); medical records

detailing her hospitalizations for heart issues, related laboratory tests, and follow-up treatment

50

(Tr. 24-25); medical records related to the treatment of her thyroid condition, osteoarthritis, and inflammatory arthritis (Tr. 26-27); evidence related to her alleged need for a cane (Tr. 27); and records of her mental health treatment and examinations (Tr. 27-29).

The ALJ also provided a detailed analysis of the medical opinion evidence in support of her RFC.  After considering the opinions of the state agency medical consultants, who opined that Plaintiff could perform light work with certain postural limitations, the ALJ found the opinions to be "mostly persuasive" because the medical records and Dr. Schilling's opinion supported a further limitation to standing/walking four hours in an eight-hour workday.  (Tr. 29-30.)  The ALJ found the opinions of Dr. Samsa unpersuasive and the opinion of Dr. Gornik partially persuasive because Plaintiff's complete cardiac treatment records did not support all of the stated limitations.  (Tr. 30-31.)  She found the consultative psychological examiner's first opinion unpersuasive because it indicated Plaintiff was not limited in mental functioning while "the evidence clearly show[ed] that the claimant does have problems with her mental health," but found the examiner's second opinion more persuasive because it was more consistent with the mental health records and state agency opinions.  (Tr. 30.)  She also considered the state agency psychological consultants' opinions, finding them not fully persuasive due to the use of vague and imprecise terminology that was not vocationally relevant.  (*Id*.)  The ALJ found CNP Raimey's treating opinions were not persuasive because her extreme limitations were not supported by the objective findings or limited treatment records.  (Tr. 31.)

While Plaintiff asserts that the RFC analysis is "contrary to the requirements of SSR 96-8p," she only argues generally that the ALJ's interpretation of the evidence was flawed and resulted in an RFC that was not supported by substantial evidence.  (ECF Doc. 11, p. 26-27.) She contends that the ALJ erred when she failed to include the following RFC limitations:

greater standing/walking limitations; occasional rather than frequent balancing and climbing stairs; unidentified limits on her ability to handle, finger, and feel; unscheduled breaks to account for fatigue; and restrictions to being off-task more than 25% of the workday or absent more than one day per month.  (*Id.*)  But she does not support these arguments by identifying specific errors in the ALJ's written analysis or specific records that the ALJ allegedly failed to consider, nor does she meaningfully argue that the ALJ mischaracterized any evidence.

Because Plaintiff's arguments focus on what she thinks the ALJ should have found, rather than identifying specific errors or omissions in the ALJ's written analysis, her arguments effectively ask this Court to reweigh the evidence.  But "[t]he substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts."  *Blakely*, 581 F.3d at 406 (internal citation and quotation marks omitted).  Regardless of whether Plaintiff can identify evidence to support her preferred RFC limitations, this Court cannot overturn the ALJ's contrary RFC findings "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.

Plaintiff's argument that "it [wa]s unreasonable and against the substantial weight of the evidence" for the ALJ not to adopt additional standing and walking limitations (ECF Doc. 11, p. 26) does not alter this analysis.  Specifically, Plaintiff argues that a limitation to sedentary work was required because the ALJ limited Plaintiff to standing or walking for four hours in an eight-hour workday based on Dr. Shilling's medical opinion, but Dr. Shilling did not opine regarding the impact of Plaintiff's rheumatological impairments.  (*Id.* (citing Tr. 22-23, 86-87).)  But the Commissioner correctly observes that the ALJ accounted for the impact of Plaintiff's rheumatoid arthritis when she adopted the postural and environmental limitations set forth in the medical

opinions of the state agency medical consultants, who considered both Plaintiff's cardiac and rheumatological impairments.  (ECF Doc. 13, p. 14 (citing Tr. 117-60, 163-88).)

Plaintiff's additional assertion that the RFC analysis lacked support because "the ALJ failed to consider multiple conditions as severe in nature" (ECF Doc. 11, p. 26) must fail for the same reasons articulated by this Court in Section VI.B., *supra*.  Similarly, Plaintiffs assertion that additional mental limitations were required in light of her documented anxiety and "supported by . . . Dr. Samsa's, Dr. Gornik's and Ms. Raimey's credible opinions" (*id*. at p. 27) must fail for the additional reasons articulated by this Court in Sections VI.B.3. and VI.C., *supra*.

For the reasons set forth above, the undersigned concludes that Plaintiff has not met her burden to show that the ALJ failed to comply with SSR 98-6p or lacked substantial evidence to support her RFC analysis at Step Four.  Accordingly, the Court finds Ms. Childress's third assignment of error is without merit.

### VII.   Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's final decision.


February 20, 2026


                           */s/Amanda M. Knapp*
                           AMANDA M. KNAPP
                           United States Magistrate Judge